UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- x

MICHAEL SMITH and ERNEST RANDALL,
                         **PLAINTIFFS**
         -against-

THE CITY OF NEW YORK, POLICE OFFICER FRANK
MUZIKAR, SHIELD NO. 20966, JOHN DOE #1-2,
                           **DEFENDANTS**

------------------------------------------------------------------- x

COMPLAINT AND
JURY DEMAND

Docket # 14CV3582

Plaintiffs Michael Smith and Ernest Randall by their attorneys, Stoll, Glickman & Bellina, LLP, for their complaint allege as follows:

## PRELIMINARY STATEMENT

1.    This is a civil rights action in which plaintiffs seeks relief through 42 U.S.C. §1983 for the violation of their Fourth and Fourteenth Amendment rights.

2.    The claim arises from a July 3, 2013 incident in which Officers of the New York City Police Department ("NYPD"), acting under color of state law, intentionally and willfully subjected plaintiffs to false arrest.

3.    Plaintiffs seek monetary damages (special, compensatory, and punitive) against defendants, as well as an award of costs and attorneys' fees, and such other and further relief as the Court deems just and proper.

## JURISDICTION

4.    This action arises under the Fourth, Eighth and Fourteenth Amendments to the United States Constitution and under 42 U.S.C. §1983 and §1988 and the laws and Constitution of the State of New York.

5.    The jurisdiction of this court is predicated upon 28 U.S.C. §§ 1331, 1343(a)(3) and (4), 1367(a) and the doctrine of pendent jurisdiction.

VENUE

6.    Venue is laid within the Eastern District of New York in that Defendant City of New York is located within and a substantial part of the events giving rise to the claim occurred within the boundaries of the Eastern District.

NOTICE OF CLAIM

7.    Within 90 days of the events giving rise to this claim, plaintiff Michael Smith filed written notice of claim with the New York City Office of the Comptroller.  Over 30 days have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed of.

PARTIES

8.    Plaintiff Michael Smith is a resident of Kings County in New York State.

9.    Plaintiff Ernest Randall is a resident of the City of Charlotte in the State of North Carolina.

10.    The City of New York (or "the City") is a municipal corporation organized under the laws of the State of New York.  At all times relevant hereto, Defendant City, acting through the New York Police Department (or "NYPD"), was responsible for the policy, practice, supervision, implementation, and conduct of all NYPD matters and was responsible for the appointment, training, supervision, discipline and retention and conduct of all NYPD personnel. In addition, at all times here relevant, Defendant City was responsible for enforcing the rules of the NYPD, and for ensuring that the NYPD personnel obey the laws of the United States and the State of New York.

11.    Police Officer Frank Muzikar, Shield No. 20966 was, at all times here relevant, a police officer of the NYPD, and as such was acting in the capacity of an agent, servant and employee of

the City of New York.  On information and belief, defendant Muzikar was involved in the illegal arrest of plaintiffs and/or failed to intervene in the actions of his fellow officers.  Defendant Muzikar is sued in his individual capacity.

12.   All other individual defendants ("the officers"), including John Doe #1-2, individuals whose names are currently unknown to plaintiff, are employees of the NYPD, and are sued in their individual capacities.

13.   At all times here mentioned defendants were acting under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs and usages of the City and State of New York.

## FACTUAL ALLEGATIONS

14.   On July 3, 2013, at approximately 6:00 pm, plaintiffs were driving in Brooklyn NY.

15.   Plaintiff Smith was driving the vehicle.  Plaintiff Randall was in the passenger seat.

16.   Defendant police officers were in a police vehicle driving behind plaintiffs' car.

17.   At or around 4614 Clarendon Road, defendants turned on their car's flashing lights and sirens indicating for plaintiffs to pull over.

18.   Plaintiff Smith pulled the car over when signaled by the defendants.

19.   Defendants approached the car's driver side and asked Mr. Smith for his identification, which he immediately provided.

20.   Defendants ordered both plaintiffs to exit the vehicle.

21.   Plaintiffs exited the vehicle as ordered.

22.   Defendants searched plaintiffs' vehicle.

23.   The search of plaintiffs' vehicle was conducted without consent, probable cause to believe any criminal activity was occurring, or any other valid legal basis to search.

24.     Defendants recovered a small folding knife from the glove compartment of the vehicle.

25.     Defendants then placed both plaintiffs under arrest.

26.     The plaintiffs were taken to a police precinct and processed for arrest.

27.     At or around 11:00 pm, plaintiff Randall was given a Desk Appearance Ticket and released from the police precinct.

28.     Plaintiff Smith was transported to central booking to await arraignment.

29.     Plaintiff Smith was arraigned and released on his own recognizance late at night on July 4, 2013 after spending approximately 30 hours in police custody.

30.     Defendants claimed that the knife they recovered was a "gravity knife", a type of folding knife which can be opened one handed through the force of gravity or the application of centrifugal force.

31.     Plaintiffs were each charged with Criminal Possession of a Weapon in the 4th Degree based upon defendants' representation that the knife recovered was a gravity knife.

32.     Contrary to defendants' claims, the knife they recovered was not a gravity knife, and the possession of it was not prohibited by the New York Penal Law.

33.     Moreover, the knife defendants recovered had a blade of less than 4 inches in length.

34.     All charges brought against both plaintiffs were later dismissed.

35.     Defendants lacked probable cause or reasonable suspicion to believe plaintiffs had been involved in any illegal activity.

36.     At all times during the events described above, the defendant police officers were engaged in a joint venture and formed an agreement to violate plaintiff's rights.  The individual officers assisted each other in performing the various actions described and lent their physical presence and support and the authority of their office to each other during said events.  They

failed to intervene in the obviously illegal actions of their fellow officers against plaintiff.

37.   During all of the events above described, defendants acted maliciously and with intent to injure plaintiff.

DAMAGES

38.   As a direct and proximate result of the acts of defendants, plaintiffs suffered the following injuries and damages:

a.   Violation of their rights pursuant to the Fourth and Fourteenth Amendments to the United States Constitution;

b.   Violation of their rights to Due Process of Law under the Fourteenth Amendments to the United Stated Constitution;

c.   Loss of liberty;

d.   Emotional trauma and suffering, including fear, embarrassment, humiliation, emotional distress, frustration, extreme inconvenience, anxiety;

e.   Economic loss.

**FIRST CAUSE OF ACTION**
(U.S.C. § 1983)

39.   The above paragraphs are here incorporated by reference.

40.    Defendants have deprived plaintiffs of their civil, constitutional and statutory rights under color of law and have conspired to deprive them of such rights and are liable to plaintiff under 42 USC § 1983.

41.   Defendants' conduct deprived plaintiffs of their right to be free of unreasonable searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United States Constitution.  Defendants' conduct also deprived plaintiff of their right to due process of law, pursuant to the Fourteenth Amendment of the United States Constitution.

42.     Defendants falsely arrested plaintiffs and failed to intervene in each other's obviously illegal actions.

43.     Plaintiff has been damaged as a result of defendants' wrongful acts.

## SECOND CAUSE OF ACTION
(MUNICIPAL AND SUPERVISORY LIABILITY)

44.     The above paragraphs are here incorporated by reference.

45.     The City is liable for the damages suffered by plaintiff as a result of the conduct of their employees, agents, and servants, in that, after learning of their employees' violation of plaintiff's constitutional rights, they failed to remedy the wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event.  The City has been alerted to the regular use of excessive force and false arrests by its police officers, but has nevertheless exhibited deliberate indifference to such excessive force and false arrests; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case.

46.     The City's continuing failure to deter police misconduct has led to ever increasing numbers of lawsuits for repeat routine misconduct by the same officers, same units and same precincts. In 2012, New York City paid out over $131 million for the fiscal year, compared to 2011, when it paid out more than $166 million, and 2010, when it paid $128 million.[1] In the past ten years, the City of New York has paid nearly a billion dollars on lawsuits brought against the NYPD.[2] More than 40% of those settlements in 2011 stem from excessive force and false arrest.

---

[1] Mayor Michael Bloomberg's preliminary Management Report for FY 2013, available at http://www.nyc.gov/html/ops/downloads/pdf/pmmr2013/2013_pmmr.pdf, see page 6, last visited on June 25, 2013.

[2] "NYPD Has Paid Out Nearly $1 Billion in Claims Over Past Decade," by Associated Press Writers Colleen Long and Jennifer Peltz, http://www.law.com/jsp/article.jsp?id=1202473432953, October 15, 2010 last visited on June 25, 2013.

47.     The widely held assumption is that civil rights lawsuits deter police misconduct. "The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails.  Wyatt v. Cole, 504 U.S. 158, 161, (1992) citing Carey v. Piphus, 435 U.S. 247, 254-257, (1978). "As far as we know, civil liability is an effective deterrent [to civil rights violations], as we have assumed it is in other contexts." See Hudson v. Michigan 547 U.S. 586, 598 (2006) citing Correctional Services Corp. v. Malesko, 534 U.S. 61, 70 (2001) and Nix v. Williams, 467 U.S. 431, 446, (1984). "It is almost axiomatic that the threat of damages has a deterrent effect (citation omitted) surely particularly so when the individual official faces personal financial liability." Carlson v. Green, 446 U.S. 14, 21, (1980), citing Imbler v. Pachtman, 424 U.S. 409, 442, and footnote 6 (1976).

48.      However, the City of New York has isolated NYPD officers from accountability for its civil rights lawsuits by indemnifying officers who violate the constitutional rights of citizens, and, as a result, is preventing civil rights lawsuits from having any deterrent value to the City, the NYPD or its officers. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the expense to the City of the officers' lawsuit liability, even after multiple lawsuits.  In 1999, former Comptroller Alan Hevesi reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers.  This "total disconnect" between officers' liability and NYPD discipline, results in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests or officers who have incurred large sums of civil rights liability. The City Council, Government Operations Committee, despite being alerted at a City Council hearing on December 12, 2009, and on other occasions, to the

obvious problem of officers and precincts with a disproportionate responsibility for civil rights lawsuit liability, has failed to take action to hold officers or precincts accountable. It has likewise failed to hold an investigative hearing into what extent specific officers, units and precincts are disproportionately responsible for New York City civil rights lawsuits.

49.     The City is liable for the damages suffered by plaintiffs in that, after learning of their employees' violation of plaintiffs' constitutional rights, they failed to remedy the wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event.

50.     The aforesaid event underlying plaintiffs' factual allegations was not an isolated incident.  The City has been aware for some time, from lawsuits, notices of claim, complaints filed with the Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of their police officers unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers.  Nevertheless, the City has allowed policies and practices that allow the aforementioned to persist.

51.     The City has been alerted to the regular use of false arrests by its police officers, through lawsuits, civilian complaints, notices of claim, City Council hearings, newspaper reports, and cases resulting in declined prosecutions and dismissals, but has nevertheless exhibited deliberate indifference to such false arrests; that deliberate indifference caused the violation of plaintiff's constitutional rights in this case.

52.     Nevertheless, the City has repeatedly resisted attempts to catalog even basic information gleaned from civil rights lawsuits that could improve training, leadership, supervision, and discipline in the NYPD.  The City's deliberate indifference towards the contents of civil rights litigation, towards individual officers repeatedly named in lawsuits, towards incidents repeatedly occurring in the same precinct, towards patterns of misconduct that arise in civil rights litigation has caused the constitutional violations against plaintiff.

53.     Additionally, according to a report of the New York City Bar Association issued in 2000, the City has isolated its law department from the discipline of police officers. Civil rights lawsuits against police officers have no impact on the officers' careers, regardless of the officers' responsibility lawsuit liability, even after multiple lawsuits.  Alan Hevesi, as New York City Comptroller, in 1999 reported that there was a "a total disconnect" between the settlements of even substantial civil claims and police department action against officers.  Nothing has changed since 1999 and the present regarding this "total disconnect" between officers' liability and NYPD discipline, resulting in a system where the City pays vast sums to settle false arrests, but the NYPD does nothing to investigate nor address the underlying causes of such false arrests.

54.     The City has also been alerted to the regular use of stop and frisks by its police officers, which disproportionately target people of color, despite the lack criminal evidence that such stop and frisks actually produce, and despite the humiliation, inconvenience and constitutional violations that the majority of law-abiding people, mostly in communities of color, suffer as a result. In 2008, of the 531,159 New Yorkers were stopped by the police, 465,413 were totally innocent (88 percent). From the total, 271,602 were black (51 percent); 167,111 were Latino (32 percent); and 57,407 were white (11 percent). In 2007, of the 468,732 New Yorkers were stopped by the police, 407,923 were totally innocent (87 percent). From the total in 2007,

242,373 were black (52 percent), 142,903 were Latino (31 percent), 52,715 were white (11 percent).[3]

55.     The City is also aware that the misconduct does not stop at the regular use of stop and frisks to violate the civil rights of innocent people. In 2008, more than half (51%) of the summonses issued by NYPD officers were dismissed for legally insufficient evidence. Police officers have repeatedly told New York City news investigations that their supervisors pressure them into reaching "performance goals" or quotas, resulting in the violation of innocent New Yorker's civil rights.[4]

56.     The Civilian Complaint Review Board ("the CCRB"), a City police oversight agency, often finds complainants lack credibility based in part on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to the CCRB.  In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB.  The CCRB has no enforcement mechanisms once making a finding against an officer; it can only make recommendations to the NYPD, once finding misconduct by an officer.

57.     The NYPD, once receiving a substantiated complaint by the CCRB, fails to adequately discipline officers for misconduct.  In 2002, the percentage of officers who were the subject of

---

[3] See New York Civil Liberties Union "Stop and Frisk Report" available at http://www.nyclu.org/issues/racial-justice/stop-and-frisk-practices last visited on June 25, 2013.
[4] See WABC's Jim Hoffer's three installments (March 3, May 23 and May 25, 2010) on NYPD quotas available at http://abclocal.go.com/wabc/story?section=news/investigators&id=7461355 last visited on June 25, 2013.

substantiated CCRB complaints who received no discipline was 47%; in 2007, it was 75%.[5] The NYPD Department Advocate, which is endowed with the responsibility of following up on substantiated CCRB charges, is understaffed and under-utilized. Furthermore, in the extraordinarily rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer, which the police commissioner has done on many occasions. This entire procedure provide so many opportunities for meritorious complaints of false arrests to be dismissed or disregarded that there is no credible, effective oversight of police department employees, despite an apparently elaborate set of oversight mechanisms.

58. Further, the City has no procedure to notify individual officers or their supervisors of unfavorable judicial review of their conduct or to calculate the total liability of an individual officer or of a precinct. Without this notification, improper search and seizure practices and incredible testimony go uncorrected, problematic supervision or leadership at the precinct level goes ignored, and repeated misconduct by individual officers goes unaccounted for. Even occasional judicial findings that officers have testified incredibly are not reported routinely to the police department or any oversight agencies.

59. All of the aforementioned has created a climate where police officers and detectives lie to prosecutors and in police paperwork and charging instruments, and testify falsely, with no fear of reprisal. "Informal inquiry by the court and among the judges of this court, as well as knowledge of cases in other federal and state courts, has revealed anecdotal evidence of repeated,

---

[5] The NYCLU issued a report in September 2007 on the CCRB detailing the failure of the NYPD to follow up on substantiated CCRB complaints, among other failures by the City and the CCRB to address police misconduct: "Mission Failure: Civilian Review of Policing in New York City, 1994-2006", available at: http://www.nyclu.org/files/ccrb_failing_report_090507.pdf, last visited on June 25, 2013.

widespread falsification by arresting police officers of the New York City Police Department. Despite numerous inquiries by commissions and strong reported efforts by the present administration-through selection of candidates for the police force stressing academic and other qualifications, serious training to avoid constitutional violations, and strong disciplinary action within the department-there is some evidence of an attitude among officers that is sufficiently widespread to constitute a custom or policy by the city approving illegal conduct of the kind now charged." See Colon v. City of New York, et al, 2009 WL 4263362 (E.D.N.Y.)(Weinstein, J.).

60.   The City is aware that all of the aforementioned has resulted in violations of citizens' constitutional rights.   Despite such notice, the City has failed to take corrective action.   This failure and these policies caused the officers in the present case to violate plaintiffs' civil rights, without fear of reprisal.

61.   Plaintiff has been damaged as a result of the deliberate indifference of the Defendant City.

## THIRD CAUSE OF ACTION
### (FALSE ARREST AND ILLEGAL IMPRISONMENT)

61.   The above paragraphs are here incorporated by reference.

62.   Defendants subjected plaintiff Smith to false arrest, false imprisonment, and deprivation of liberty without probable cause.

63.   Defendants intended to confine plaintiff Smith.

64.   Plaintiff Smith was conscious of the confinement and did not consent to it.

65.   The confinement of plaintiff Smith was not privileged.

66.   As a result of the false arrest, imprisonment, and deprivation of liberty, plaintiff was damaged.

## FOURTH CAUSE OF ACTION

(RESPONDEAT SUPERIOR)

67. The above paragraphs are here incorporated by reference.

68. Defendants' intentional tortious acts were undertaken within the scope of their employment by defendant City of New York and in furtherance of the defendant City of New York's interest.

69. As a result of defendants' tortious conduct in the course of their employment and in furtherance of the business of defendant City of New York, Plaintiff was damaged.

WHEREFORE, plaintiffs demands judgment against the defendants, jointly and severally, as follows:

A.    In favor of plaintiffs in an amount to be determined by a jury for each of plaintiff's causes of action;

B.    Awarding plaintiffs punitive damages in an amount to be determined by a jury;

C.    Awarding plaintiffs reasonable attorneys' fees, costs and disbursements of this action; and

D.    Granting such other and further relief as this Court deems just and proper.

**<u>JURY DEMAND</u>**

Plaintiff demands a trial by jury.

DATED:     June 6, 2014
           Brooklyn, New York                    Respectfully yours,

                                                 By: Nicholas Mindicino, Esq.
                                                 Stoll, Glickman & Bellina, LLP
                                                 Attorneys for Plaintiff
                                                 475 Atlantic Avenue, 3rd Floor
                                                 Brooklyn, NY  11217
TO:     City of New York                         (718) 852-3710
        Corporation Counsel Office               (718) 852-3586
        100 Church Street                        NMindicino@stollglickman.com
        New York, NY  10007

        Officer Frank Muzikar, Shield No. 20966
        NYPD – Staten Island Gang Unit
        1 Police Plaza
        New York NY 10007